**LAW OFFICES OF ARMAND SALESE, PLLC**
**Armand Salese**
1717 N. Tucson Blvd.
Tucson, AZ 85716
(520) 903-0825
PCCN 50468/AZBN 003002
as@saleselaw.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JAMES H. STARK AND RICKY P. STARK, ) | No. 4:12-CV-00422-RCC |
| ) | |
| Plaintiffs, ) | REPLY RE: MOTION TO VACATE ARBITRATION AWARD AND RESPONSE TO MOTION TO CONFIRM ARBITRATION AWARD |
| ) | |
| vs. ) | |
| ) | |
| UBS FINANCIAL SERVICES, INC ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiffs, by and through their undersigned counsel, hereby submit their Reply Re: Motion to Vacate Arbitration Award and Response to Motion to Confirm Arbitration Award. This Reply is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES
### I. THIS MATTER MAY, AND SHOULD BE, REMANDED.

Rather than address the merits of the Stark's argument that this matter be remanded for clarification, UBS' Response hangs entirely on *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008), which declared that the statutory grounds for modification and vacatur are the exclusive grounds under the Federal Arbitration Act ("FAA"). UBS suggests that the Starks' Motion is foreclosed by *Hall* and claims that the Starks' Motion does not cite any post-*Hall* authority. Both facets of UBS' argument are undermined by the discussion of *Hartford Steam Boiler Inspection and Insurance Company v. Underwriters at Lloyd's and Companies Collective et al.*, 121 Conn. App. 31, 46-48, 994 A.2d 262 (2010) at p.5 of the Motion.

**A.      Remand of an Ambiguous Award Has Been Permitted Post-*Hall*.**

*Hartford Steam* is a post-*Hall* case and rejects UBS' position after an extensive review of the cases on this issue, including *Hall*. ("Our research reveals no decision, federal or otherwise, indicating that *Hall Street Associates, L.L.C.*, overruled the body of precedent permitting a remand to an arbitration Panel for clarification or outlawed that procedure. Rather, the procedure remains viable.") *Id.* at 46. Apparently UBS' research also failed to turn up such a case because no such case is cited in its Response. Footnote 2 of the Motion (pp.5-6) has a quote from *Hartford* listing a number of post-*Hall* federal cases permitting a remand.

**B.      Remand is Authorized Under the FAA.**

UBS' Response similarly attempts to undermine the Motion by implying that all the authorities supporting a remand were decided under arbitration common law rather than the FAA. This simply is inaccurate. Among the cases reviewed in that portion of *Hartford* was *Raymond James Financial Services, Inc. v. Bishop*, 596 F.3d 183, 196 (4th Cir. 2010) (upholding remand for clarification as viable post-*Hall* under 9 U.S.C. §10(a)(4))). See also *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982) ([C]ourts have power to remand cases to an arbitration Panel in certain circumstances under the Federal Arbitration Act, 9 U.S.C. 10(e), 11, as well as under the federal common law . . . ." Likewise, UBS attacks the citation to *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 n. 1 (9th Cir.), cert. denied, 459 U.S. 1071, 103 S. Ct. 491, 74 L. Ed. 2d 633 (1982) ("[r]emand to an arbitrator for clarification and interpretation is not unusual in judicial enforcement proceedings.") on the ground that it was not a case decided under the FAA. But the Ninth Circuit subsequently relied on *McClatchy* in a case that was decided under the FAA, *Kyocera Corp. v. Prudential-Bache Trade*, 299 F.3d 769, 780 (9th 2002) ("In this case, it

is clear that the district court ordered resubmission to the arbitration committee for clarification and interpretation of the award made, rather than for a reexamination of the merits, or a modification of the award. . . . We therefore determine that the district court did not err in seeking clarification from the Tribunal."), *vacated on other grounds*, 341 F.3d 987 (9th Cir. 2003) .  In short, a number of cases decided under the FAA have remanded ambiguous arbitration awards and there is nothing in the *Hall* decision which eliminates that option.

**C.    UBS' Inability to Comply With the Award Announced After the Issuance of the Award Renders It Ambiguous.**

UBS' Response of course goes on to argue that even if remand is available, there is no ambiguity in the instant Award.  As noted in the Motion, an ambiguity requiring remand need not appear on the face of the award but may arise due to a change in circumstances underlying the award.  *Off. & Prof. Empl. v. Brownsville Gen. Hosp.*, 186 F.3d 326, 332-33 (3rd Cir. 1999).  UBS seeks to distinguish *Brownsville* by pointing out that it was not an FAA case.  But this is simply irrelevant because *Brownsville* simply applied the holding in *Colonial Penn Ins. Co. v. Omaha Indemnity Co.*, 943 F.2d 327, 333 (3d Cir. 1991), which *was* an FAA case.  And the quote in the Motion summarizes that *Colonial Penn* (FAA) decision.  UBS offers no Ninth Circuit authority to the contrary, nor does it offer any analysis criticizing the approach of *Colonial Penn*.  See also *Olympia & York Florida Equity Corp. v. Gould*, 776 F.2d 42, 45 (2d Cir. 1985) (award remanded due to ambiguity because it "failed to deal explicitly with the contingency that arose" which constituted "sufficient evidence of lack of a 'mutual, final, and definite award' within [9 U.S.C.] §10(d)  to warrant a remand to the arbitrators").

In *Colonial Penn* the award was based on an assumption that $8 million insurance reserves were held; this assumption was later discovered to have been mistaken.  Remand to clarify the resulting ambiguity was held appropriate.  Similarly, here, the arbitration Panel assumed that UBS had the computer information it took from the Starks and could

3

1    return it – an assumption which has since been found to be untrue.

2         UBS suggests that its inability to perform is utterly without effect, since the Award

3    merely ordered it to turn over what (if anything) it had.  Not only is this indifference not

4    expressed in the Award, it raises the question of why the Panel would bother ordering the

5    return of the property.  Likewise, the Panel's inquiry into whether UBS had the ability to

6    return the property would seem pointless if the Panel didn't care if anything was going to

7    be returned.  Clearly the Panel found that the Starks were entitled to recover under a claim

8    they presented; the return was one of the remedies sought in their Counterclaim.  The

9    Panel clearly intended for the Starks to receive something of value commensurate to what

10   had been taken from them.  UBS also notes that the Panel would not have otherwise

11   awarded damages because it denied damages for retention of the information because it

12   found UBS had acted in good faith.  The denial of damages as to one claim does not

13   preclude damages as to another claim.  Had the Panel been aware that the electronic

14   information was corrupted, altered and out and out lost it would have otherwise have

15   compensated the Starks.  UBS counsel acknowledged this tradeoff in his closing, pointing

16   out that *if* the property was returned to the Starks they would not have damages. As noted

17   in the Motion (pp.4-5), the destruction of the property would warrant damages on their

18   conversion claim.

19   **D.    UBS' Claim of Performance Under Its Interpretation of the Award**
           **Does Not Overcome the Above Ambiguity and at Best Creates Another**
20         **Level of Ambiguity.**

21        UBS further argues that in any event even if the Award is ambiguous, there is no

22   need to remand to address the lack of clarity because UBS is ready to provide the

23   Goldmine software, and has already produced the data in its possession.  Ironically, UBS

24   can only make these assertions by exploiting another ambiguity – namely, does the Award

25   call for UBS to provide the software and data in the form and condition it existed in when

26   it was taken from the Starks, or whether any old approximation will do, even if it is

27

28                                                    4

unusable.

The Starks were awarded specific performance. ("UBS is ordered to return . . . the "Goldmine" software program removed from the computers of the JRS Group (Ricky Peter Stark and James Harold Stark).") Award at par.4.  As noted in the Motion, the "Goldmine" software is a commercial software program that had been modified to the Starks' specifications to enable access to thousands of prospective clients accumulated since 1993 (Exhibit 1, August 2, 2012, letter from J.R. Guthrie).  Defendant UBS does not assert that it can return the software it took.  See UBS' Response at p.2 ("UBS does not possess a backup of the Goldmine software as it existed on the Starks computer at the time of their resignation. . . UBS simply does not have the exact software and cannot provide it").

Nevertheless, UBS argues that it can comply with the Award by purchasing an off-the-shelf copy of Goldmine.  But the Starks maintain that this is not what was ordered.  The Starks read the Award to order UBS to provide the specific software program removed from their specific computers.

UBS argues that the Starks are misreading the Award because it does not expressly refer to the customization of the software.  But the Award orders the return of what was taken off the computers.  If UBS had taken a customized '67 Corvette and was ordered to return it, indicated it was stored in a garage, claimed that there would be no damages if it were returned, were ordered to return the Starks' Corvette, offering another vehicle would not comply with the order.  It is the Starks' position that it is UBS misreading the Award.

Likewise, Defendant UBS was ordered to return to Plaintiffs "[t]he contacts or data entries".  UBS' claim that it has already complied with the Panel's order with respect to the data fares no better than the software.  UBS initially provided data that was corrupted and completely unreadable.  It subsequently offered the data in another unusable format containing "random characters" which prevent the data from being

sorted into individual fields.  See Exhibit 2 hereto, (May 24, 2012 letter from Sean Oseran).  The Starks have been informed by a computer expert that the data tendered by UBS cannot be used to reconstruct the Goldmine database.  See Exhibit 3 hereto (July 11, 2012 letter from Sean Oseran and Exhibit 1 (August 2, 2012, letter from J.R. Guthrie).  Once again it is the Starks' position that the Award requires UBS to provide the data in the same condition as it existed on their computers, in a fully usable format.

UBS cannot avoid a remand by claiming to have performed its obligation under the Award.  At best, UBS has simply highlighted another ambiguity requiring clarification.  The Court should refrain from interpreting an ambiguous award; it is for the arbitration Panel to clarify the ambiguity.  See e.g. *Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274 (7th Cir. 1989) ("A district court should not interpret an ambiguous arbitration award.  If an award is unclear, the court should send it back to the arbitrator for clarification.") (internal citations omitted).

**II.  ALTERNATIVELY, THE AWARD SHOULD BE VACATED UNDER 9 U.S.C. § 10(A)(1) AS OBTAINED BY FRAUD AND/OR UNDUE INFLUENCE WHERE THE PANEL WAS LED TO BELIEVE THAT THE ELECTRONIC INFORMATION COULD BE RESTORED TO THE STARKS.**

An independent ground for vacating the Award is that it was the result of obtained by fraud and undue means.  The Panel ultimately ordered the return of the Goldmine software "removed from the computers of the JRS Group" as well as "[t]he contacts or data entries."  It did so after ascertaining whether it was available to be returned by inquiring of UBS' counsel:

**Panel Chair Nielson:** "I have a couple of questions on an older [issue] about Goldmine, et cetera.  And they are questions for counsel. . . .

**Panel Chair Nielson:** Now for Mr. Ceresney, do you know, can you tell the Panel whether UBS, as I understand the testimony from Held and this witness, when the computers that belonged to the Starks or RJS were returned to them, they were cleaned

1   out.  My question is, do you know whether the data was entered into UBS's info system?

2   **Mr. Ceresney:** My understanding is that it was archived.

3   **Panel Chair Nielson:**  What does that mean?

4   **Mr. Ceresney:** It means it was copied, placed on a disk and put aside,

5   ***

6   **Panel Chair Nielson:** If they do ask the Panel for an order to turn it over, you have

7   something to turn over?

8   **Mr. Ceresney:** It should be available.  We'll double check.

9   (Exhibit 2 to Motion, Excerpt of Transcript p.211).  No information to the contrary was

10   provided to the Panel thereafter.  During closing, counsel for UBS argued that the Starks

11   would have no damages with respect to this property if they got it back (*Id*. 1012-1015).

12       UBS argues that no representations were made as to the software, but it is clear

13   that the Panel was inquiring about the material wiped from the computer which included

14   the software.  Likewise, the reference to the Starks not having any damages if the material

15   was returned obviously encompassed the software that was taken.  In questioning James

16   Stark, UBS' attorney went through a list of damages that "relate to the Goldmine

17   database" – *which included the initial software cost* and then asked about the damages if

18   "you got back the Goldmine database" (Exhibit 4 hereto, Transcript pps. 597-601[1]).

19

---

20

21      [1]UBS' Response misleadingly implies at p. 6 that Mr. Stark testified that there

22 were no damages flowing from the loss of the software.  It is clear from an examination of the entire exchange at pp.530-531 between Mr. Stark and the panel member that Mr.

23 Stark simply testified that the Goldmine software would have had limited utility to them without the missing data.  It has no bearing on the value of the software or the damages

24 flowing from its destruction as customized.  Like a car and fuel, having one without the other is less than ideal; but to acknowledge this is not to deny the value of the vehicle or

25 damages flowing from its loss.  Certainly UBS does not dispute the fact that the

26 destruction of the software had some economic consequence.

27      Similarly, UBS' suggestion that James Stark testified that the customization was a

28

UBS argues that undue influence requires behavior that is "immoral if not illegal" and not just "sloppy or zealous lawyering." (citing A.G. Edwards & Sons, Inc., 967 F.2d 1401 (9th Cir. 1992)). When asked whether the electronic property could be returned, counsel for Defendant led the Panel to believe it could be returned. Then UBS' counsel argued that the Starks would have no damages if the electronic property were returned. This argument was ultimately successful as the Panel ordered the return of the property and no damages. Leading the Panel to believe the property was available for return, asking the Panel to rely on that representation in denying an award of damages and succeeding, only to then acknowledge that it cannot reply and that the Starks are out of luck is nothing if not a machination intended to influence the Panel. See *A.G. Edwards* at 1403-04 (undue influence means any improper machination of persuasion; distinguishing presentation of a meritless defense)) . Thus, this is not a matter of a defense lacking in merit, but an instance of encouraging the Panel to give a non-monetary award as a viable remedy when in fact it was not so.

While courts should be "slow" to vacate on the ground of fraud, *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293 (9th Cir. 1982), UBS would have the Court read slow as synonymous with "frozen." Where (as here) the fraud was not discoverable, is materially related to an issue in the arbitration, and is established by clear and convincing

---

feature of the off-the-shelf Goldmine software is not supported by the record; he merely testified that it was a "customizable system." Moreover the notion that the standard model is available in a "customized" form is nonsensical. Finally, the testimony was that the cost of the software was $7,225. TR. 598. UBS does not represent that it has tendered this sum, but only offered to purchase a "store-bought" version of the software, i.e. *without* the customization – obviously at a lesser amount. (A standard copy of Goldmine sells for $1,299. See Exhibit 5 hereto.) Mr. Guthrie stated in his August 2, 2012, letter that the Goldmine program "...had been highly customized to accommodate larger/additional fields to facilitate their drip marketing program.....I would estimate a minimum of $10,000 of programming costs alone." See Exhibit 1.

evidence, vacating the arbitration award is required. *Id.*

Likewise, this sequence qualifies as fraud warranting vacation under 9 U.S.C. § 10(a)(1). The fraud was not discoverable upon the exercise of due diligence prior to the arbitration; the Starks had no basis for doubting the representation of UBS' counsel to the Panel any more than a representation made in response to an interrogatory, and FINRA rules of procedure do not allow for the inspection of such property – points UBS does not challenge in its Response. The fraud materially related to an issue in the arbitration; the Panel's question was plainly aimed at determining what remedy was appropriate and feasible. Finally the fraud/undue means are established by clear and convincing evidence. The representations pre and post-Award differ significantly and appear on the record and on counsel's letterhead.[2]

### III. THE AWARD IS NOT FINAL OR DEFINITE DUE TO THE FAILURE TO DEAL WITH THE CONTINGENCY OF THE UNAVAILABILITY OF THE ELECTRONIC INFORMATION.

UBS attempts to discourage vacating the Award under 9 U.S.C. § 10(a)(4) ("where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."), arguing that this is rarely successful and given the narrowest interpretation. However, these caveats were leveled at attempts to argue that the arbitrators exceeded their powers[3] – a position

---

[2] UBS errs in characterizing the inability of returning the electronic information as "newly discovered evidence." *Lafarge Conseils et Etudes v. Kaiser Cement*, 791 F.2d 1334, 1338 (9th Cir. 1986) simply held that new evidence in itself will not provide a basis for vacating an award. The Starks are not trying to use this as "newly discovered evidence" and *Lafarge* distinguishes between "newly discovered evidence" and evidence which could not have been discovered with diligence pre-award to establish fraud which *does* warrant vacating an award.

[3] UBS cites *Blue Tee Corp. v. Koehring Co.*, 999 F.2d 633 (2nd Cir. 1993) which involved a challenge based on exceeding authority; *Blue Tee* in turn cites *Andros Compania Maritima v. Marc Rich & Co.*, 579 F.2d 691, 703 (2nd Cir. 1978) for the rule

not urged here.   As demonstrated above, the fact that UBS cannot perform is a contingency creating an ambiguity and therefore an indefinite award.  See *Olympia & York Florida Equity Corp. v. Gould*, 776 F.2d 42, 45 (2d Cir. 1985) (award remanded due to ambiguity because it "failed to deal explicitly with the contingency that arose" which constituted "sufficient evidence of lack of a 'mutual, final, and definite award' within [9 U.S.C.] §10(d)  to warrant a remand to the arbitrators").

### IV.  THE COURT SHOULD VACATE THE AWARD, REMAND THE MATTER TO FINRA, AND DENY UBS' CROSS-MOTION TO CONFIRM THE AWARD.

For all the foregoing reasons and those in the Starks' Motion, the Court should vacate the award and remand to FINRA and deny UBS' Cross-Motion to Confirm the arbitration Award. *Johnson v. Wells Fargo Home Mortg.*, 635 F.3d 401, 412 (9th Cir. 2011) (district court faced with motions to confirm and vacate award must rule on both and either confirm or vacate, modify or correct the award).

### CONCLUSION

For all the foregoing reasons, the Starks respectfully request that the Award be vacated and the matter remanded to FINRA.

DATED this 3rd day of August, 2012.

**LAW OFFICES OF ARMAND SALESE, PLLC**

/S/Armand Salese
**Armand Salese**
Attorney for Plaintiffs

---

("We have consistently accorded the narrowest of readings to the Arbitration Act's authorization to vacate awards "[w]here the arbitrators exceeded their powers," 9 U.S.C. § 10(d)").

1    I certify that I electronically
     transmitted the foregoing
2    document to the Clerk's Office
     using the CM/ECF System
3    on August 3, 2012.

4    /S/Vicki Adams
     Vicki Adams
5    Assistant to Armand Salese

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28